**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY AUSTIN**<br>*Plaintiff*,<br><br>v.<br><br>**UNITED STATES OF AMERICA**,<br>*Defendant*. | :<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action<br><br><br>No. 24-2324 |

**PEREZ, J.** **September 16, 2026**

**MEMORANDUM**

This Federal Tort Claims Act case arises from a May 27, 2022 motor vehicle collision between Plaintiff Gary Austin and a United States Postal Service vehicle. Liability for the collision is not in dispute. The parties agreed that the Postal Service driver breached the duty of care owed to Austin, was acting within the scope of his federal employment, and that his breach was the sole cause of the collision. Joint Statement of Agreed Upon Facts at ¶¶ 1–7, ECF No. 58; Trial Ex. 6.

During the bench trial held on February 17 and 20, 2026, both sides chiefly argued over medical causation and damages. Austin advances a broad causation theory. He contends the collision produced traumatic lumbar disc herniations, chronic lumbar pain, the condition for which a spinal cord stimulator was implanted, and a probable need for future lumbar treatment. The Government argues that the crash caused principally temporary sprains and strains superimposed on age-related degeneration. The trial record does not support either position in full.

The Court finds that the collision caused cervical, thoracic, and lumbar sprain-and-strain injuries, a minor left-shoulder injury, and, most importantly, a permanent aggravation of Austin's preexisting cervical degenerative disease. That last finding is not merely an inference drawn from Austin's testimony. The Government's own expert expressly conceded permanency and accident

causation, and the parties incorporated those concessions into their Joint Statement. Joint Stmt. ¶¶ 21-24. The Court is not persuaded, however, that Austin proved by a preponderance of the evidence that the collision caused the structural lumbar pathology for which the spinal cord stimulator was ultimately implanted or that it will probably require future lumbar surgery.

The Court also concludes that Austin did not prove recoverable past medical expenses, a sufficiently certain amount of lost earnings or diminished earning capacity, future medical expenses, or property damages. But those failures do not reduce the permanent cervical injury to a routine strain case. The collision permanently aggravated significant cervical degeneration and stenosis, led to multiple invasive cervical procedures that Austin never needed before the crash, caused ongoing neck pain, disrupted ordinary activities, produced continuing anxiety and fear associated with driving, and diminished Austin's sense of independence and his ability to participate in family and recreational life. For those past and future noneconomic harms, considered together and without double counting, the Court awards **$350,000 in noneconomic damages**.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court sets out its findings of fact and conclusions of law below.

# I. FINDINGS OF FACT

## A. The Accident and Austin's Pre-Accident Condition

Austin was sixty-six years old on May 27, 2022 when the collision occurred. Feb. 17, 2026 Trial Tr. 18:3. He was driving on Lancaster Avenue in Berwyn, Pennsylvania, when his vehicle collided with a Postal Service vehicle driven by federal employee Craig Fishbaugh. The parties agreed that Fishbaugh breached his duty of care and that his breach was the sole cause of the accident. Joint Statement ¶¶ 1–7; Trial Ex. 6.

The force of the collision was sufficient to deploy Austin's airbags and render his vehicle inoperable; his vehicle was towed. Joint Stmt. ¶¶ 3–4. Although Austin initially described traveling approximately thirty to thirty-five miles per hour before braking, on cross examination, he acknowledged his prior testimony that his vehicle had slowed to approximately five to ten miles per hour by impact. Feb. 17, 2026 Trial Tr. 72:8–74:6. The Postal Service vehicle was traveling approximately ten to fifteen miles per hour. *Id.* at 41:18–21.

The collision speed alone does not resolve the medical questions. The physical consequences were substantial enough to deploy the airbags and disable both vehicles, but Austin also had preexisting spinal degeneration. The task is therefore to separate the harm caused by the collision from the preexisting medical conditions and those that progressed independently afterward.

Austin's medical history is important: neither expert regarded his spine as anatomically pristine before May 2022. In 2014, Austin reported pain extending from his right hip into his leg and was diagnosed with sciatica. A 2015 record documented a discrete episode of right lower-back pain. The parties nevertheless agreed that the 2014 sciatica resolved, that the 2015 lumbar sprain or strain resolved within months, and that there were no documented back complaints between May 2015 and the accident seven years later. Joint Stmt. ¶¶ 15–17.

His cervical history was more significant. An April 19, 2017 MRI was obtained for "neck pain with right upper extremity radiculopathy" and showed "[m]ultilevel degenerative changes of the cervical spine with severe right foraminal narrowing at C3-C4 and C4-C5 and moderate spinal canal narrowing at C4-C5." Trial Ex. 47 at USA-AUSTIN-000003; Joint Stmt. ¶¶ 19-20. That objective history makes it inaccurate to describe Austin's cervical spine as anatomically normal or as having never been symptomatic before May 2022.

The existence of degeneration is not the same as pre-accident disability. The parties agreed that Austin had never required chiropractic treatment or steroid injections for neck or back pain before the collision. Joint Stmt. ¶ 18. Immediately before the accident, he was working for DoorDash, typically driving for much of the day and repeatedly entering and exiting his vehicle. Joint Stmt. ¶ 14. His earlier work included custodial employment at Montgomery County Community College and physical work for Amazon. Joint Stmt. ¶¶ 10, 12-13. The record contains no pre-accident medical restriction that prevented him from performing those activities.

Austin was not a particularly reliable historian of remote medical events. When asked whether he remembered seeing Dr. Beale for back problems in 2014, Austin repeatedly answered by reference to what the medical record showed; after the Court directed him to answer from his own recollection, he acknowledged, "I can't remember back that far." Feb. 17, 2026 Trial Tr. 66:9–67:7. He likewise was "not exactly sure" whether he had seen Dr. Beale for back pain in 2015 and later testified, "I can't remember all the way back to '15." *Id.* at 67:16–68:12. And, as to 2017, Austin acknowledged that he had no independent recollection of a reported fall at work and initially relied on what the records showed when asked whether he remembered undergoing a cervical MRI. *Id.* at 68:13–69:22.

Those lapses matter because the contemporaneous medical evidence documents the events Austin could not independently recall, including the 2014 sciatica, the 2015 low-back complaint, and the 2017 cervical MRI obtained for "[n]eck pain with right upper extremity radiculopathy." Joint Stmt. ¶¶ 16–20; Trial Ex. 47. The Court therefore gives reduced weight to Austin's recollection of his remote medical history when it conflicts with contemporaneous records. Nevertheless, that does not require the Court to reject testimony concerning observable changes after the accident. Austin's daughter, Brenae, who lived with him both before and after the

collision, testified that she observed no pre-accident physical limitations, but afterward saw him become markedly less active, struggle to sit comfortably in a car, repeatedly reposition himself, and spend much of his time in a hospital bed. Feb. 17, 2026 Trial Tr. 104:5–105:13, 106:18–110:7. Brandon Austin, Plaintiff' son, likewise described no observable pre-accident physical limitations and testified that, after the collision, Austin appeared uncomfortable in vehicles and constantly moved and repositioned himself in an effort to become comfortable. *Id.* at 113:12–114:22, 115:21–116:13. The Court credits those observations to the extent they are consistent with the medical records, agreed facts, treatment history, and other evidence.

**B. Austin's Initial Treatment**

Austin went from the scene of the accident to Paoli Hospital. He reported neck, low-back, shoulder, and head symptoms. The emergency department examination was reassuring in several respects: the records described normal or near-normal spinal range of motion, no acute distress, and no acute traumatic abnormality on the CT and x-ray studies obtained that day. The listed diagnoses included acute cervical strain, lumbar strain, and acute left-shoulder pain. Trial Ex. 45.

Those records are important to the lumbar-causation dispute, but they do not establish that Austin sustained only trivial injuries. In the months that followed, he underwent cervical and lumbar MRI studies, rehabilitation, pain-management treatment, orthopedic evaluation, and cervical injections and nerve procedures. Plaintiff's evidence identifies, among other cervical treatment, an August 9, 2022 C5 epidural injection, a January 30, 2023 C6-C7 epidural steroid injection, and a June 8, 2023 C5-C7 medial branch block. Pl. Proposed Findings ¶¶ 33-35. The Government's expert agreed that multiple cervical injections and nerve blocks were sequelae of the collision. Feb. 20, 2026 Trial Tr. 74:20-75:11.

Austin later underwent a trial and permanent implantation of a spinal cord stimulator. While the existence of this treatment is undisputed, its legal significance depends entirely on causation. Ultimately, the Court finds that Austin failed to prove that the May 2022 collision more likely than not caused the lumbar pathology requiring the device. The Court therefore does not treat the SCS surgery, its scars, or its future replacement costs as compensable accident damages.

### C. The Expert Evidence

#### 1. Dr. Nirav Shah

Austin presented Nirav Shah, M.D., a board-certified neurosurgeon. Shah has practiced neurosurgery since 2005 and is a currently practicing spine surgeon. Approximately eighty percent of his practice concerns spinal conditions; he sees about seventy patients each week and performs approximately five scheduled surgeries each week, with occasional emergency procedures. Shah Dep. 5:9-6:2. He was board certified in neurosurgery in 2009 and recertified in 2019. *Id.* at 6:9-12. He testified that reviewing spinal MRI studies is a regular part of his current clinical practice and that he personally reviewed Austin's 2022 and 2023 studies rather than relying only on reports. *Id.* at 6:13-7:1, 13:7-24.

Dr. Shah emphasized "clinical correlation"—reading imaging together with the history, examination, and evolution of symptoms rather than viewing an MRI in isolation. *Id.* at 13:17-24. He rejected the premise that a relatively benign emergency department range-of-motion examination categorically excludes traumatic disc injury. He explained that a disc may tear at the time of trauma and then progressively herniate. Shah Dep. 12:7-10.

In Dr. Shah's view, Austin's later radiating complaints were consistent with such a "progressive evolutionary worsening over time." *Id.* at 12:11-14. He acknowledged that the acute records did not document sciatica or radiculopathy but explained that later radiating symptoms

could reflect progressive nerve-root compression as disc material shifted, enlarged, or leaked inflammatory material. *Id.* at 12:15-13:3.

Shah also relied on signal characteristics he believed were visible on the July 2022 lumbar MRI. He explained that comparatively brighter signal may reflect hydration and inflammation associated with recent trauma. Shah Dep. 15:13-16 ("Whenever something is brighter on an MRI, it's typically hydrated. Well, inflammation is something that's hydrated and inflammation typically occurs on a recent trauma.").

Because he perceived that signal relatively soon after the collision and did not perceive the same signal on later imaging, Dr. Shah considered the change consistent with an acute injury whose inflammation later subsided. He ultimately diagnosed posttraumatic L3-L4 and L5-S1 disc pathology, low-back pain with radiculopathy, lumbar facet syndrome, and chronic pain, and attributed the later spinal-cord-stimulator treatment to the collision. Shah Dep. 20:14-22:14; Trial Ex. 36.

Dr. Shah's cervical opinion was considerably less controversial. He acknowledged the 2017 cervical history and concluded that the accident at least aggravated the preexisting cervical condition, producing cervicalgia. Shah Dep. 21:16-23 ("I felt at the very least his neck was aggravated and that would result in what we call cervicalgia.").

The Court finds Dr. Shah highly qualified on modern spine practice, spinal imaging as used in a current surgical practice, and the range of mechanisms by which traumatic pathology can evolve. The Court also finds his cervical-aggravation opinion persuasive and consistent with the parties' agreed facts. The Court is less persuaded, however, that his case-specific lumbar causation opinion establishes traumatic herniation by a preponderance of the evidence. His higher-signal theory was not reported by the radiologists interpreting the relevant studies, the acute clinical

presentation did not show the neurological or mechanical findings one might expect from multiple traumatic lumbar herniations, and the principal contemporaneous treating records were more cautious about attributing the structural lumbar findings to the collision. Dr. Ricciuti, for example, expressly linked several soft-tissue diagnoses to the crash but did not similarly attribute the identified lumbar disc abnormalities. Trial Ex. 46 at 3-5.

The Court also does not treat the later implantation of a spinal cord stimulator as proof of the cause of the underlying pain. The treatment demonstrates that Austin experienced substantial chronic symptoms; it does not, standing alone, determine whether the structural condition producing those symptoms was degenerative or due to the trauma of the accident.

**2. Dr. Richard Mandel**

The United States presented Richard Mandel, M.D., an orthopedic surgeon with a long career in orthopedic medicine. Mandel graduated from Temple University in 1972 and Jefferson Medical College in 1976, completed a general surgery internship at Jefferson, and completed a four-year orthopedic residency at Jackson Memorial Hospital/University of Miami, serving as chief resident before finishing in 1981. Feb. 20, 2026 Trial Tr. 6:3-25. He then practiced orthopedics for decades and taught for many years, first at the University of Pennsylvania and later at the Philadelphia College of Osteopathic Medicine. *Id.* at 7:1-25. The Court does not minimize those credentials.

However, the weight of an expert opinion turns on the fit between the expert's experience and the question being decided, not merely the length of the curriculum vitae. The fit here is imperfect in several important respects. Dr. Mandel stopped performing spine surgery about twenty-five years ago. Feb. 20, 2026 Trial Tr. 41:4-8 ("I stopped doing spine surgery around 2000 or so.").

Dr. Mandel emphasized that he continued to see patients for second opinions about spinal surgery after 2000 but acknowledged that even that clinical work continued only until approximately 2016. He again agreed, "I have not done spine surgery for 25 years." *Id.* at 41:15-25. He stopped performing any surgery in approximately 2016, for his own medical reasons. *Id.* at 11:1-7. By approximately 2023, he had closed his office and stopped seeing ordinary clinical patients. *Id.* at 7:6-15.

His present professional work is principally forensic. On cross-examination, when asked what he currently does, Mandel explained, "I am semi-retired. I review cases. I do review - I review medical/legal cases and examine patients who are involved in litigation. Part-time basis." Feb. 20, 2026 Trial Tr. 40:14-20.

Mandel remains licensed, but his Pennsylvania license is in retired, limited status, which he agreed does not permit him to treat the general public. *Id.* at 10:13-25, 47:14-48:1. Although he maintains an active Florida license, Mandel acknowledged that he is not presently seeing patients in an active orthopedic practice. *Id.* at 53:13-25.

The passage of time is particularly relevant to opinions touching modern spine surgery and spinal-device care. Mandel testified that he attempts to remain current, but he conceded that surgical techniques have advanced and that he has not personally performed those newer procedures. Asked about contemporary "tools," "devices," "screws," and stimulators used in spine surgery since 2000, he answered, "[t]hat's correct" to the proposition that he had not used them. *Id.* at 42:25-43:9. He is not a neurosurgeon, radiologist, or pain-management specialist. *Id.* at 43:10-44:4. And his later clinical practice had shifted away from the spine toward the upper extremity; he agreed that he was known as a "shoulder guy" and "hand guy." *Id.* at 54:10-18.

Those limitations are especially concrete with respect to Austin's spinal cord stimulator. Dr. Mandel has never implanted or removed one. He did not know the manufacturer of Austin's device, did not know its expected service life, and acknowledged that because he regarded the device as unrelated to the accident, he did not investigate those questions. *Id.* at 54:1-55:25. He also offered no expertise concerning the cost of future SCS care. *Id.* at 56:12-25.

There were also limits to the record on which Dr. Mandel initially formed his opinions. He acknowledged that he did not have Dr. Navani's pain-management records when he prepared his reports and that he did not have Austin's primary care records when he issued his first opinion. *Id.* at 49:1-52:25. Supplemental review can cure an incomplete initial record, but these facts reinforce the need to evaluate Dr. Mandel's opinions question by question rather than accept them wholesale.

The Court therefore does not adopt the Government's proposed characterization of Mandel as categorically more persuasive than Shah. Nor does the Court discount Shah merely because he has testified frequently in litigation. On questions closely tied to current spine surgery, contemporary spinal-device treatment, and clinical MRI interpretation in an active surgical practice, Shah's present-day experience is substantially closer to the subject matter. Mandel's historical orthopedic experience remains relevant, particularly to general musculoskeletal examination and the distinction between soft-tissue injury and age-related degeneration, but the Court affords diminished weight to his opinions insofar as they depend upon current spine-surgical or SCS expertise.

### 3. The Evidence Does Not Establish That the Collision Caused Plaintiff's Lumbar Herniations.

The Court's above assessment of the experts does not require the Court to accept Dr. Shah's entire lumbar theory. The burden remains with the Plaintiff. The Court finds the evidence inconclusive as to whether the collision caused the lumbar herniations identified by Dr. Shah. Therefore, Austin failed to meet his burden of proof.

The Court places substantial weight on Austin's presentation in the hours and months immediately following the collision. The contemporaneous evidence is key. At Paoli Hospital, Austin certainly reported low-back pain, and the Court does not doubt that the collision injured his lumbar region. However, the examination did not reveal acute neurological deficit, marked loss of motion, spasm, or another objective finding that independently demonstrated acute structural disc injury. The initial diagnosis was lumbar strain. Trial Ex. 45. Later radiologists described disc abnormalities but did not identify the higher-signal inflammatory feature on which Dr. Shah placed substantial causal weight. Furthermore, Dr. Ricciuti, who ordered the early imaging and treated Austin after the crash, expressly attributed lumbar sprain and strain, thoracic sprain and strain, shoulder injuries, and trapezial myofascial pain to the collision without comparably attributing the disc abnormalities themselves. Trial Ex. 46 at 3-5.

Dr. Mandel's explanation of that acute presentation is one piece of the record, though not the sole basis for this finding. He testified that a patient with multiple traumatic lumbar herniations would ordinarily present with substantially more acute objective findings and pain. His formulation was categorical in places, and the Court does not adopt it as an inflexible medical rule. Still, the absence of those findings weighs against Shah's proposed traumatic-lumbar chain, especially when considered together with the radiology reports and treating-provider evidence.

Accordingly, the Court finds that the collision caused a lumbar sprain-and-strain injury but does not find by a preponderance of the evidence that it caused the structural lumbar disc pathology, the lumbar chronic-pain condition for which the SCS was implanted, or the probable need for future lumbar fusion or decompression. This finding rests on the totality of the contemporaneous record, not on wholesale acceptance of Dr. Mandel over Dr. Shah.

#### 4. The Permanent Cervical Aggravation

The question concerning Plaintiff's cervical spine is fundamentally different. Both experts agreed that the collision aggravated Austin's preexisting cervical disease, and the Government's own expert made unusually clear concessions concerning causation, treatment, and permanency. On cross-examination, counsel asked Dr. Mandel directly: "You believe that he suffered a permanent aggravation of his cervical degenerative disc disease, correct?" Feb. 20, 2026 Trial Tr. 74:4-7. Dr. Mandel responded unequivocally, "Yes."

Dr. Mandel then agreed that Rothman Orthopaedics sent Austin for cervical epidural injections, that those injections were treatment for sequelae of the collision, and that Austin underwent multiple cervical injections and nerve blocks because of the accident:

> Q. And was that treatment for sequela of the car accident?
>
> A. Yes.
>
> Q. And that was all from the car accident, correct?
>
> A. Yes.

Feb. 20, 2026 Trial Tr. 74:20-75:6. When counsel suggested that Austin's neck was now better, Dr. Mandel rejected the premise, stating, "No. I think he had a permanent aggravation. I don't think he's completely better." Feb. 20, 2026 Trial Tr. 75:7-11.

Dr. Mandel further agreed that an epidural injection is not ordinary treatment for a simple sprain or strain. He explained that Austin had significant cervical degenerative changes and stenosis capable of affecting nerve roots, which were aggravated by the accident, "and that's why they ordered the epidural." *Id.* at 104:16-105:16.

The Court places particular weight on these concessions because they came from the Government's retained expert despite the generally restrictive causation position he otherwise advanced. They also correspond to the parties' Joint Statement. The parties agreed that trauma can cause an asymptomatic condition to become symptomatic; that Mandel agreed Austin suffered a permanent aggravation of his preexisting cervical degenerative disc disease due to the collision; that the cervical epidural injections were accident-related; and that Austin had not completely recovered. Joint Stmt. ¶¶ 21-24.

The appropriate finding is, therefore, not that the collision created Austin's cervical degeneration or that the degeneration is irrelevant. The degeneration and stenosis predated the crash. Still, before May 2022, Austin had not required the invasive cervical treatment that followed it, and after the crash, the preexisting pathology became sufficiently symptomatic to require repeated cervical procedures. The collision permanently aggravated the cervical condition. The United States is responsible for that additional harm.

The cervical, thoracic, and lumbar sprain-and-strain injuries and minor left-shoulder injury are distinct from the permanent cervical aggravation. Dr. Mandel testified that sprain-and-strain injuries generally heal on a spectrum: approximately six weeks for a minor injury, three months for a moderate injury, and six months for a more severe injury. Feb. 20, 2026 Trial Tr. 70:18-71:1. He could not identify an exact date when Austin's soft-tissue injuries resolved, but estimated that

they likely did so within approximately six months. *Id.* at 72:18-73:5. The Court finds that those soft-tissue injuries substantially resolved. The permanent cervical aggravation did not.

**D. Austin's Ongoing Cervical Symptoms**

Much of Austin's asserted total disability was intertwined with lumbar complaints and the SCS, and the Court has not found that condition was caused by the accident. The Court nevertheless credits significant portions of Austin's testimony that are specifically consistent with the permanent cervical aggravation and with the undisputed treatment history.

Austin testified that his neck remained painful at trial, placing the pain at "probably a 6 or a 7." Feb. 17, 2026 Trial Tr. 61:21-24. He described it as an everyday problem when walking or remaining in the same position too long and testified that the neck pain affects his day to the point that he sometimes tries to remain in bed to avoid provoking it. *Id.* at 62:1-8. Those subjective reports are materially corroborated by Dr. Mandel's admission that Austin sustained a permanent cervical aggravation and is not completely recovered.

Austin also described how the collision materially reduced his ability to participate in the ordinary activities that made up his life before the accident. He testified to traveling, attending sporting events, spending time with his grandchildren, and performing household chores before the collision. At trial, he testified that he previously "had a good life," could "travel," "play with [his] grandkids," and attend basketball games. He contrasted that with his current routine. He now spends substantially more time at home, can walk only limited distances before developing neck pain, no longer attends basketball games, and no longer performs certain household tasks. Feb. 17, 2026 Trial Tr. 62:9–63:3.

The record also supports a component of accident-related anxiety and fear. Austin testified that bumps in a vehicle hurt and that he is "scared to drive" because "every time I see a car I jump."

*Id.* at 53:1-8. The Court does not diagnose Austin with post-traumatic stress disorder; no competent psychiatric diagnosis is necessary to recognize ordinary fear, apprehension, and emotional distress resulting from the collision and its aftermath.

Finally, the injury affected Austin's sense of independence and family role. He testified that being unable to do what he previously did sometimes made him feel "less than a man." *Id.* at 60:20-25. He also described being unable to play with or lift his grandchildren as before. *Id.* at 61:1-14. The Court does not credit every claimed functional limitation as cervical in origin, but it finds that the permanent neck injury, recurrent pain, and accident-related fear caused real inconvenience, embarrassment and humiliation, and a meaningful loss of ordinary pleasures and independence.

## II. CONCLUSIONS OF LAW

### A. **Governing Law**

The FTCA makes the United States liable, subject to statutory limitations, "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Because the collision occurred in Pennsylvania, Pennsylvania substantive tort law governs. 28 U.S.C. § 1346(b)(1); *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000).

A plaintiff must prove damages with evidence from which they can be determined with reasonable certainty. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225–26 (3d Cir. 2003). The same principles of causation limit recovery to harm caused or increased by the tort. A defendant is not responsible for the underlying preexisting disease itself, but is responsible for additional harm caused by aggravating that condition. *See Offensend v. Atl. Refin. Co.*, 185 A. 745, 747 (Pa. 1936).

### B. Medical Causation

Austin proved by a preponderance of the evidence that the collision caused temporary cervical, thoracic, and lumbar sprain-and-strain injuries, a minor left-shoulder injury, and a

permanent aggravation of preexisting cervical degenerative disease and stenosis. The cervical finding follows not only from Dr. Shah's opinion, but from Dr. Mandel's concessions and the parties' agreed facts. Joint Stmt. ¶¶ 21-24.

Austin did not prove by a preponderance of the evidence that the collision caused the structural lumbar disc pathology upon which the SCS and future-surgery theories depend. The Court reaches that conclusion notwithstanding its reservations concerning the currency and scope of Mandel's spine-specific expertise. The contemporaneous clinical presentation, the absence of the MRI feature on which Shah heavily relied from the interpreting radiologists' reports, and the limited causal diagnoses in important treating records leave the Court unpersuaded that traumatic lumbar herniation is more likely than not. The Court therefore does not shift the costs and consequences of the SCS, its scars, or future lumbar surgery to the United States.

### C. Past Medical Expenses

No past medical expenses will be awarded. Before trial, the Court precluded Austin "from presenting evidence of any medical expenses, or recovering damages for, that he fails to establish were not paid or payable by his insurers." ECF No. 47 (Feb. 11, 2026). *See Patel v. Tepox-Vasquez*, No. 14-2271, 2015 WL 4630278, at *2-3 (E.D. Pa. Aug. 3, 2015). The principal quantified past charge developed at trial concerned the spinal cord stimulator. Austin did not establish that the charge was not paid or payable by insurance. And independently, the Court has not found the stimulator causally attributable to an accident-caused lumbar injury. Past medical damages are therefore **$0**.

### D. Lost Earnings and Diminished Earning Capacity

Austin also failed to prove a recoverable amount of past lost earnings. A self-employed plaintiff's loss must be measured by net income, not gross receipts. *Rodgers v. Yellow Cab Co.*,

147 A.2d 611, 619 (Pa. 1959); *Longdon v. Conestoga Transp. Co.*, 169 A. 884, 886 (Pa. 1934). Austin estimated that DoorDash paid him approximately $1,000 to $1,200 per month, but cross-examination established that the figure did not account for mileage, gasoline, vehicle wear, cellphone expenses, or other costs of earning those receipts. Feb. 17, 2026 Trial Tr. 64:6-66:8. The record therefore does not permit a nonspeculative calculation of net lost income.

Diminished earning capacity is conceptually distinct from lost wages. Pennsylvania permits recovery when an injury reduces a person's economic horizon, even if the loss cannot be equated mechanically to prior wages. *See Ruzzi v. Butler Petroleum Co.*, 588 A.2d 1, 7 (Pa. 1991). Nevertheless, a permanent injury, standing alone, does not establish a compensable reduction in earning power; the evidence must show the effect of the compensable injury on future capacity with sufficient certainty. *Kearns v. Clark*, 493 A.2d 1358, 1364–65 (Pa. Super. Ct. 1985).

Here, much of the work-disability evidence was tied to the lumbar condition and spinal cord stimulator, not to the cervical aggravation standing alone. Although the Court finds that Austin's permanent cervical injury makes prolonged activity and driving more difficult, the record does not provide a reliable basis for assigning a separate dollar value to cervical-specific lost earning capacity. Past lost earnings and diminished earning-capacity damages are therefore **$0**. The functional consequences of the neck injury remain relevant, however, to noneconomic loss.

**E. Future Medical Expenses**

No separately quantified future medical award is warranted. The substantial future costs Austin requested—replacement of the spinal cord stimulator, repeated lumbar procedures, and possible lumbar decompression or fusion—depend on the lumbar-causation theory the Court has not found proven. The evidence does support the possibility that Austin may intermittently require

conservative medication for his cervical condition, but no reliable cost evidence permits the Court to assign a separate future medical amount without speculation. Future medical damages are **$0**.

**F. Property Damage and Disfigurement**

No property damage award is warranted because the record does not establish a compensable unresolved property loss belonging to Austin or a reliable measure of vehicle value. Nor does the Court separately award damages for disfigurement. The scars emphasized by Austin resulted from the SCS procedures, and the Court has not found those procedures were caused by the accident. Those scars therefore cannot be charged to the United States.

**G. Noneconomic Damages**

Pennsylvania permits compensation for the nonpecuniary consequences of physical injury, including physical pain and suffering, mental anguish and distress, inconvenience, embarrassment and humiliation, and loss of the ability to enjoy life's ordinary pleasures. *See Mader v. Duquesne Light Co.*, 241 A.3d 600, 607 n.1 (Pa. 2020); *Haines v. Raven Arms*, 640 A.2d 367, 370 (Pa. 1994); *McManamon v. Washko*, 906 A.2d 1259, 1281–82 (Pa. Super. Ct. 2006). Where the injury is permanent, the award may compensate both past and reasonably probable future noneconomic loss.

These are not separate causes of action, and the Court does not stack a separate number for each descriptor. They are different aspects of one injury to a person. The Court therefore makes one lump-sum noneconomic award and takes care not to count the same harm twice.

The Government's proposed characterization of this case as principally a sprain-and-strain case understates the injury it conceded. This is not merely a matter of soreness that resolved in weeks. The Government's own expert agreed that Austin sustained a permanent aggravation of significant preexisting cervical degeneration and stenosis, that the condition was sufficiently

symptomatic after the accident to warrant cervical epidural treatment and nerve blocks, that those procedures were sequelae of the collision, and that Austin is not completely recovered. Feb. 20, 2026 Trial Tr. 74:4-75:11, 104:16-105:16; Joint Stmt. ¶¶ 21-24.

The treatment itself is significant. Before the collision Austin had never required steroid injections to his neck or back. Joint Stmt. ¶ 18. Afterward, he underwent multiple cervical procedures, including epidural injections and a medial branch block. The Government's expert agreed that an epidural was not treatment for a simple strain and explained that aggravated degeneration and stenosis affecting the nerve roots supplied the reason for that treatment.

The permanency evidence is equally important. This is not a case in which the Court must infer future pain from a plaintiff's subjective prediction. The Government's expert expressly described the aggravation as permanent and said Austin is not completely better. That medical testimony supplies an objective basis to compensate future pain, inconvenience, and loss of normal activity even though the exact intensity of symptoms may vary over time.

The credible neck-specific testimony demonstrates continuing pain. Austin placed his neck pain at six or seven out of ten at trial and testified that it occurs every day with walking or prolonged positioning. Feb. 17, 2026 Trial Tr. 61:21-62:8. The Court does not accept that every day in bed or every physical restriction is caused by the cervical condition alone, but it does find that the permanent neck injury materially interferes with ordinary movement and comfort.

The injury also diminished Austin's enjoyment of life. He described a pre-accident life that included travel, basketball games, time at parks and other activities with his grandchildren, and household chores. He now spends substantially more time at home, no longer attends basketball games, walks more limited distances before neck pain develops, and no longer performs some of the ordinary family and household activities he once performed. *Id.* at 61:1-63:3. The Court credits

those losses to the extent they are consistent with the permanent cervical condition rather than the unproven lumbar/SCS theory.

The Court also compensates the ordinary mental distress and apprehension caused by the collision. Austin testified that he is "scared to drive" and that "every time I see a car I jump." *Id.* at 53:1-8. That testimony does not establish a separately diagnosed psychiatric disorder, nor does the Court award damages for PTSD. It does establish real accident-related fear and anxiety that have made an activity central to Austin's former work and independence more difficult and distressing.

Embarrassment and humiliation likewise form part of the compensable human loss. Austin worked throughout much of his adult life, sometimes at more than one job, and testified that his inability to do what he previously did sometimes made him feel "less than a man." *Id.* at 59:20-60:25. The Court does not adopt Austin's contention that he is totally disabled from all work by accident-caused injuries; but the permanent loss of some physical independence, the need for repeated cervical procedures, the persistent pain, and the diminished ability to participate in family activities reasonably support an award for humiliation and loss of self-sufficiency in addition to physical discomfort.

Comparable awards provide a context, not a tariff. The Government cites *McKinney v. United States*, No. 22-4924, 2024 WL 2925313, at *12 (E.D. Pa. June 10, 2024), where the court awarded $50,000 for cervical and lumbar sprain-and-strain injuries. However, the proven injury here materially exceeds transient soft-tissue injury because the cervical aggravation is permanent and required repeated invasive cervical treatment. Conversely, cases involving fusion surgery, fractures, catastrophic surgical complications, or SCS-related injuries are imperfect comparators because the Court has not attributed Austin's lumbar SCS course to this collision. Third Circuit

authority treats comparable awards as useful guideposts while recognizing that pain-and-suffering damages remain intensely case specific. *See Waldorf v. Shuta*, 142 F.3d 601, 623 (3d Cir. 1998); *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989).

Considering the acute soft-tissue injuries, the permanent cervical aggravation, the invasive cervical treatment, the persistence of neck pain, the loss of ordinary activities and pleasures, the inconvenience of living with a permanent symptomatic cervical condition, Austin's accident-related fear of driving, and the embarrassment and humiliation associated with his diminished independence, the Court finds **$350,000** to be fair and reasonable compensation for past and future noneconomic loss.

The amount is intentionally limited to harms the Court finds attributable to the May 2022 collision. It does not compensate Austin for the spinal cord stimulator surgery, SCS scars, future SCS replacement, traumatic lumbar herniations, future lumbar fusion, or a lifetime of total work disability. It instead reflects the injury actually proven: temporary multi-region soft-tissue injuries together with a permanent aggravation of substantial cervical degeneration and stenosis that required multiple invasive cervical procedures and continues to affect Austin's comfort, mobility, emotional wellbeing, independence, and enjoyment of ordinary life.

## III. CONCLUSION

Austin has proven that the negligence of the United States caused temporary cervical, thoracic, and lumbar sprain-and-strain injuries, a minor left-shoulder injury, and a permanent aggravation of his preexisting cervical degenerative disease. He has not proved that the collision caused his lumbar disc herniations or protrusions, the condition for which his spinal cord stimulator was implanted, or the probable need for future lumbar surgery.

Austin is not entitled to a separate award for past medical expenses, past or future lost earnings or earning capacity, future medical expenses, or property damage. He is entitled to noneconomic damages for the pain, suffering, inconvenience, and loss of life's pleasures caused by the compensable injuries.

Judgment will therefore be entered in favor of Gary Austin and against the United States of America in the amount of $350,000.